```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:02CR366 (CFD) |
| | : | |
| v. | : | |
| | : | |
| JESUS CONTRERAS | : | OCTOBER 18, 2005 |

**UNITED STATES' SENTENCING MEMORANDUM**

<u>          </u>**INTRODUCTION**

    Defendant Jesus Contreras stands convicted after a jury trial of conspiracy to possess with intent to distribute and distribution of 120 kilograms of cocaine. The evidence at trial demonstrated that a 220 kilogram shipment of cocaine was intercepted by law enforcement in Central America. After the cocaine was intercepted, Drug Enforcement Administration ("DEA") agents acting in an undercover capacity made arrangements to deliver 70 kilograms of the cocaine to the ultimate purchasers.

    On October 16, 2001, as part of a conspiracy to possess with intent to distribute the intercepted cocaine, members of the drug trafficking organization, including, among others, Carlos Aquino, Oscar Gonzalez and Hugo Jorge, traveled from New York City to Norwalk, Connecticut, to deliver a "load" car, that is, the car into which the undercover DEA agent agreed to place the 120 kilograms of cocaine. The load car was driven by Jorge and Gonzalez was a passenger. Aquino traveled to Connecticut in another automobile with at least two other conspirators.

    After extensive discussions between Gonzalez, Jorge, Aquino,

other co-conspirators and the undercover government agent, Gonzalez and Jorge agreed to leave the load car overnight in Connecticut so that undercover government agents could place the cocaine in the car. Arrangements were made for other members of the drug trafficking organization, including defendant Contreras, to pick up the load car containing 120 kilograms of cocaine on October 17, 2001.

On the evening of October 16, 2001, after the load car had been turned over to the undercover government agent, DEA agents installed a court-authorized "kill switch" in the car. The purpose of the kill switch was to allow the DEA agents to remotely disable the car after the drug traffickers, including the defendant Contreras, picked up the cocaine packed car.

On October 17, 2001, members of the drug trafficking organization, including Contreras' co-defendant Adolfo Paulino, had consensually-monitored telephone conversations with undercover government agents regarding the time, place and manner in which the load car and its contents would be retrieved. An unindicted co-conspirator explained in a consensually-monitored telephone conversation that two people would be sent to pick up the load car at an agreed-upon location. Paulino explained what he and Contreras would be wearing at the time the cocaine-packed car would be picked up.

On October 17, 2001, government agents videotaped Paulino

and Contreras for an extended period of time waiting at the pickup location.  The undercover government agent then drove the load car to the pick up location where he met with Paulino and Contreras and gave the keys to the load car to Paulino.  At the time the cocaine packed load car was transferred, the undercover agent told Paulino and Contreras that if they were going to check the merchandise in the trunk they should do it elsewhere.  In addition to being videotaped, this meeting among the undercover agent, Paulino and the defendant was also audiotaped.

After meeting with the undercover agent, Contreras drove Paulino to the load car where Paulino got in and drove out of the parking lot onto Route 1/Connecticut Avenue in Norwalk.  Contreras followed in his car.  At the first traffic light at which the load car stopped, DEA agents activated the kill switch, thereby disabling it.  At approximately 3:55 p.m., when the load car was first disabled, Contreras used his car to push the load car out of the intersection.  Minutes later, uniformed members of the Norwalk Police Department, who were acting at the direction of the DEA, approached the load car pretending to make a routine check on a stalled car.  Paulino got out of the load car and spoke with the Norwalk police officers.

Contreras drove away on Connecticut Avenue and turned into the parking lot of a Kentucky Fried Chicken approximately ½ mile from the intersection where the load car was disabled.  Contreras

then got out of his car and walked to the trunk, which he opened, took out a shirt and changed his clothing.  Contreras then walked away from his car through the back lot of a business and onto Connecticut Avenue in the direction of the stalled load car.  A government agent observed Contreras walk close to the intersection where the load car was stalled.  Contreras looked over a rise in the highway and then walked back to his vehicle.

Contreras got back into his car and drove up Connecticut Avenue and parked across the street from where the load car was stalled.  Contreras briefly entered a store and then returned to his car.  Contreras then drove up Connecticut Avenue and drove slowly past the stalled load car.  At approximately 4:15 p.m., a towing company removed the load car from Connecticut Avenue. Paulino then walked south on Connecticut Avenue where he was observed talking on a cellular telephone and meeting with Contreras.  Afterwards, Contreras drove his car onto Interstate 95 and traveled southbound.

## THE PRESENTENCE REPORT

The PSR found that the transaction in this case involved 120 kilograms of cocaine.  The defendant has no Criminal History points, which places him in Criminal History Category I.  The Drug Quantity Table, Section 2D1.1 of the guidelines, places the defendant at Level 36, for at least 50 kilograms but less than 150 kilograms of cocaine.  Thus, the PSR calculates the

defendant's sentencing guidelines range as Criminal History Category I, Offense Level 36, with a resulting range of 188 to 235 months.

This calculation is prior to any consideration of a minor role adjustment being requested by the defendant. If the defendant were given such an adjustment, his range would be reduced pursuant to U.S.S.G. § 2D1.1(a)(3) to Level 28, Criminal History Category I, which results in a sentencing range of 78 to 97 months.

## **THE DEFENDANT'S CLAIMS**

The defendant has filed a sentencing memorandum in which he makes several claims. First, the defendant claims that he is entitled to an adjustment for having a minor role in the offense. Second, the defendant claims that his due process rights, in conjunction with ex post facto principles, are violated by the imposition of a sentence under the Supreme Court's remedial decision in <u>Booker</u>, rather than under the mandatory guidelines applicable at the time of his offense. Third, the defendant is seeking a non-guidelines sentence. The government will address each of these claims below.

## **DISCUSSION**

A.  <u>Minor Role</u>

The defendant bears the burden of proving his reduced level of culpability by a preponderance of the evidence. <u>See, e.g.</u>,

United States v. Castano, 234 F.3d 111, 113 (2d Cir. 2000). U.S.S.G. § 3B1.2, comment n.3 provides that the determination of whether a mitigating role reduction is appropriate is highly fact-specific and depends upon "the nature of a defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." United States v. Garcia, 920 F.2d 153, 155 (2d Cir. 1990) (per curiam). A minor role adjustment is not available merely on a showing that "the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' . . . as compared to the average participant in such a crime." Rahman, 189 F.3d at 159 (citing United States v Ajmal, 67 F.3d. 12, 18 (2d Cir. 1995)). U.S.S.G. § 3B1.2, comment n.3. The determination of whether a mitigating role reduction is appropriate is highly fact-specific and depends upon "the nature of a defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." United States v. Garcia, 920 F.2d 153, 155 (2d Cir. 1990) (per curiam). A minor role adjustment is not available merely on a showing that "the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor'

. . . as compared to the average participant in such a crime." Rahman, 189 F.3d at 159 (citing United States v. Ajmal, 67 F.3d. 12, 18 (2d Cir. 1995)). Our appellate court will review an appellate court's evaluation of a defendant's role-in-the-offense for clear error. See Castano, 234 F.3d at 113.

The government puts forward these standards for the Court to consider in making the determination whether the defendant is entitled to a minor role adjustment. The government takes no position on the defendant's request, assuming that it is a request for a minor, two level adjustment. The Court and the parties are aware of the defendant's involvement in this case from the facts brought out at the trial and the government does not intend to set forth any additional facts.

B.  Ex Post Facto Claim

The defendant next claims that his due process rights, in conjunction with ex post facto principles, are violated by the imposition of a sentence under the Supreme Court's remedial decision in Booker (referring to the Court's opinion expressed through Justice Breyer, which makes the guidelines advisory rather than mandatory), rather than under the mandatory guidelines applicable at the time of his offense.

It is the government's understanding that the defendant is no longer pushing this claim. In any event, this claim has been rejected by every circuit to consider it. See United States v.

7

Dupas, 419 F.3d 916 (9th Cir. 2005) (rejecting ex post facto claim); United States v. Jamison, 416 F.3d 538 (7th Cir. 2005) (same); United States v. Lata, 415 F.3d 107 (1st Cir. 2005) (same); United States v. Scroggins, 411 F.3d 572, 576 (5th Cir. 2005) (same); United States v. Duncan, 400 F.3d 1297 (11th Cir. 2005) (same), petition for cert. filed, ___ U.S.L.W. ___ (U.S. July 20, 2005) (No. 05-5467).

Further, it is the government's position that under United States v. Gonzalez, 420 F.3d 111, 131 (2d Cir. 2005), "[i]f a defendant is convicted only on a lesser unquantified drug charge, he must be sentenced pursuant to § 841(b)(1)(C), which generally provides no mandatory minimum sentence." Here, the jury found the defendant guilty but did not attribute a specific quantity of drugs to him. Thus, the defendant here faces a sentence of 0 to 20 years under Gonzalez. It is now for the Court to determine, by a preponderance of the evidence, what amount of drugs is attributable to the defendant and where in the guideline range the defendant should be sentenced. It is the government's understanding that the defendant concurs in this position.

    C.   Non-Guidelines Sentence

The defendant next moves for a non-Guidelines sentence. As this Court is aware, the Second Circuit summarized the current state of sentencing law as follows:

> at this point, we can identify several essential aspects of Booker/Fanfan that concern the selection of

>sentences.  First, the Guidelines are no longer
>mandatory.  Second, the sentencing judge must consider
>the Guidelines and all of the other factors listed in
>section 3553(a).  Third, consideration of the
>Guidelines will normally require determination of the
>applicable Guidelines range, or at least identification
>of the arguably applicable ranges, and consideration of
>applicable policy statements.  Fourth, the sentencing
>judge should decide, after considering the Guidelines
>and all the other factors set forth in section 3553(a),
>whether (1) to impose the sentence that would have been
>imposed under the Guidelines, i.e., a sentence within
>the applicable Guidelines range or within permissible
>departure authority, or (ii) to impose a non-Guidelines
>sentence.  Fifth, the sentencing judge is entitled to
>find all the facts appropriate for determining either a
>Guidelines sentence or a non-Guidelines sentence.

United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005).  The Second Circuit has stated emphatically, however, "that while the principles discussed in Crosby 'change the Guidelines from being mandatory to being advisory,' we have admonished district courts to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge . . . . On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to 'consider' the Guidelines and all of the other factors listed in section 3553(a).  United States v. Godding, 405 F.3d 125, 126 (2d Cir. 2005).  "To be sure, Booker does not 'render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.'  Id. at 113.  The Guidelines sentence now serves, at least, as a marker on the path toward a reasonable

sentence.  However, it is no longer necessarily the ultimate destination on that path.  In the post-Booker regime, district courts effectively must decide whether the applicable Guidelines range represents a reasonable sentence.  If, after thorough consideration of the other § 3553(a) factors in light of the particular facts of the case, the sentencing judge determines that the Guidelines sentence is not reasonable, then a non-Guidelines sentence is appropriate." United States v. Jasper, 2005 WL 2414547, *6 (S.D.N.Y. 2005).

Here, the defendant has failed to demonstrate that a Guidelines sentence is unreasonable.  Indeed, the only bases the defendant identifies for a non-Guidelines sentence is that the defendant is poor, has health problems, will be deported and that the jury did not find him responsible beyond a reasonable doubt for a specific quantity of cocaine.  These are not valid bases for a non-guidelines sentence.

First, socio-economic status is not a basis for a downward departure under U.S.S.G. § 5H1.10.  Thus, socio-economic status cannot be a basis for a finding that a Guidelines sentence is unreasonable.

Second, the defendant's status as a deportable alien is not a relevant ground for a downward departure.  "Although U.S.S.G. § 5H1.10 forbids departure based on a defendant's national origin, we have held that, in some circumstances, a defendant's status as

an alien may serve as a basis for downward departure. See U.S.S.G. § 5H1.10; United States v. Restrepo, 999 F.2d 640, 644 (2d Cir.), cert. denied, 510 U.S. 954, 114 S.Ct. 405, 126 L.Ed.2d 352 (1993). We treat alienage as a characteristic that is not ordinarily relevant for sentencing purposes, but 'pertinent collateral consequences of a defendant's alienage' may 'serve as a valid basis for departure if those consequences were extraordinary in nature or degree.' Restrepo, 999 F.2d at 644. Deportation alone does not constitute an extraordinary consequence that would justify a downward departure. See id. United States v. Tejeda, 146 F.3d 84, 88 (2d Cir. 1998) (emphasis added). Here, there is nothing extraordinary about the defendant's immigration status. Thus, it does not provide a basis for a downward departure and therefore a Guidelines sentence is not unreasonable.

Next, the defendant claims that his medical condition warrants a non-Guidelines sentence. U.S.S.G. § 5H1.4, entitled "Physical Condition, Including Drug or Alcohol Dependence or Abuse (Policy Statement)," provides in relevant part as follows:

> Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

Id. The Second Circuit has held that a qualifying impairment is

one that cannot be adequately cared for in the prison system.
See United States v. Martinez, 207 F.3d 133, 139 (2d Cir. 2000)
(superseded by rule on other grounds); United States v. Persico,
164 F.3d 796, 806 (2d Cir. 1999) ("The standards for a downward
departure on medical grounds are strict.")[1]; United States v.
Altman, 48 F.3d 96, 104 (2d Cir. 1995).

> The Bureau of Prisons
>
> provides essential medical, dental, and mental health
> services consistent with community standards in a
> correctional environment.  The Bureau uses licensed and
> credentialed health care providers in its ambulatory
> care units, supported by community consultants and
> specialists.  For inmates with chronic or acute medical
> conditions, the Bureau operates several medical
> referral centers providing advanced care.
>
> Health promotion is emphasized through counseling
> during examinations, education about effects of
> medications, infectious disease prevention and
> education, and chronic care clinics for conditions such
> as cardiovascular disease, diabetes, and hypertension.
> The Bureau promotes environmental health through its
> emphasis on a clean-air environment and the maintenance
> of safe conditions in inmate living and work areas.
> The Bureau's food service program emphasizes
> heart-healthy diets, nutrition education, and dietary
> counseling in conjunction with certain medical
> treatment.

See Bureau of Prisons Website, www.bop.gov.

Clearly, the BOP operates advanced care facilities that can provide adequate care to the defendant.  Indeed, the BOP Health

---

[1] In Persico, the defendant had a triple bypass and a cancerous kidney.  The court rejected the motion for a downward departure, finding that the Bureau of Prisons was able to provide adequate medical care.

Services Manual, also located online, provides over 300 pages of detailed information on the proper care of inmates with medical problems. Thus, there is no indication that the defendant will not receive adequate medical care in a BOP facility and thus a Guidelines sentence is not unreasonable.

Finally, the defendant claims that the jury's verdict that he was not found guilty beyond a reasonable doubt of a specific drug quantity provides a basis for a non-Guidelines sentence. The government disputes this claim. The defendant has already received the benefit of the jury's verdict and the <u>Gonzalez</u> decision in the form of not facing a mandatory minimum sentence. Prior to <u>Booker</u>, the Court could have found by a preponderance of the evidence that the defendant was still responsible for five kilograms or more and could have been sentenced to the mandatory minimum sentence. Thus, the fact that the defendant has already received that benefit means that receiving a non-Guidelines sentence would give him in effect two credits for the jury's verdict. Such a benefit, and the resulting sentence, would be unreasonable.

**CONCLUSION**

For the reasons set forth above, the Court should sentence the defendant to a Guidelines sentence.

        Respectfully submitted,

        KEVIN J. O'CONNOR
        UNITED STATES ATTORNEY

By:   ROBERT M. SPECTOR
       FEDERAL BAR NO. ct18082

For:  JAMES K. FILAN, JR.
       ASSISTANT UNITED STATES ATTORNEY
       915 LAFAYETTE BOULEVARD
       BRIDGEPORT, CONNECTICUT 06604
       (203) 696-3000
       FEDERAL BAR NO. ct15565

<u>CERTIFICATION</u>

This is to certify that a copy of the foregoing was sent via United States Mail, postage prepaid, on this date, to:

Francis J. O'Reilly, Esq.
O'Reilly & Shaw
87 Ruane Street
Fairfield, CT 06430

Dated at Bridgeport, Connecticut this 18th day of October, 2005.

```
                              _____
                         By:  ROBERT M. SPECTOR
                              ASSISTANT UNITED STATES ATTORNEY

                         For: JAMES K. FILAN, JR.
                              ASSISTANT UNITED STATES ATTORNEY
```